UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                Plaintiff,

        v.

ROOSEVELT BROOKS, TERRENCE LEWIS
and NATHANIEL IRVIN IV,

                Defendants.

_____

<u>REPORT & RECOMMENDATION</u>
and <u>DECISION & ORDER</u>

15-CR-6157G

## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Frank P. Geraci, Jr., Chief United States District Judge, dated

November 17, 2015, all pretrial matters in the above captioned case have been referred to this

Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 32).

On November 17, 2012, the grand jury returned a three-count indictment against

defendants Roosevelt Brooks ("Brooks"), Terrence Lewis ("Lewis"), and Nathaniel Irvin IV

("Irvin") (collectively, "defendants").  (Docket # 31).  The first count charges defendants with

possession of heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(C) and 18 U.S.C. § 2.  (*Id.*).  The second count charges them with using and

maintaining a premises located at 24 Fern Street, Rochester, New York for the purpose of

manufacturing, distributing, and using heroin, in violation of 21 U.S.C. § 856(a)(1) and 18

U.S.C. § 2.  (*Id.*).  The final count charges them with possession of firearms in furtherance of

drug trafficking crimes, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.  (*Id.*).

Currently pending before this Court is a motion by Lewis seeking identification of confidential informants.[1]  (Docket # 61).  Also pending are motions by all defendants to suppress tangible evidence seized from 24 Fern Street.  (Docket ## 49, 54, 58, 61).[2]  For the reasons discussed below, I recommend that the district court deny defendants' motions to suppress tangible evidence, and I will hold further oral argument on Lewis's motion for identification of confidential informants.

## FACTUAL BACKGROUND

I.   **Search Warrant for 24 Fern Street, Rochester, New York**

On October 14, 2015, Hon. Douglas Randall, Monroe County Court Judge, issued a warrant authorizing a search of 24 Fern Street, Rochester, New York.  (Docket # 49-2).  The warrant authorized a search of the entire dwelling, including "all of its storage areas, attic, garage and curtilage."  (*Id.* at 1).  It authorized a search for the following property:

> Heroin, in violation of Section(s) 220 of the New York State Penal
> Law, and all implements and paraphernalia used to prepare for
> sale, packaging and/or administer any Heroin in any form,
> including scales, sandwich bags and small plastic baggies.  Also,
> any such evidence which tends to demonstrate that a drug related
> offense was committed or that a particular person participated in
> the commission of such offense, to include written records and

---

[1]  Lewis filed omnibus motions seeking other forms of relief.  Specifically, Lewis also sought an audibility hearing, a bill of particulars, *Brady* material, discovery and inspection, Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, severance of defendants, review of presentence reports, *Giglio* material, grand jury materials, and leave to join in motions of co-defendants and to file additional motions.  (Docket # 61).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on March 9, 2016.  (Docket ## 70-71).

[2]  Brooks and Irvin also filed omnibus motions seeking other forms of relief.  Specifically, Brooks sought Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes and leave to file additional motions.  (Docket # 54).  Irvin sought an audibility hearing, *Brady* material, discovery and inspection, Rule 404(b), 608 and 609 evidence, identification of informants, and leave to join motions of co-defendants, *Jencks* material, preservation of rough notes, disclosure of plea agreements and voir dire of government experts.  (Docket # 49).  All of the above-referenced motions were decided by the undersigned or resolved by the parties in open court on January 20, 2016 (as to Irvin) and February 22, 2016 (as to Brooks).  (Docket ## 52-53, 66-67).

2

books tending to show sale and trafficking of Heroin, and money
showing profits from the sale of Heroin, pursuant to Section
690.10(4) of the New York State Criminal Procedure Law.  Also,
records reflecting the names, addresses and telephone numbers of
persons from whom Heroin is purchased and sold, including but
not limited to, address and telephone books, including those
contained in cellular phones or personal data assistants and
telephone bills, photographs and video tapes that depict individuals
involved in Heroin violations and/or photographs to assist in
helping identify drug traffickers and their associates including
undeveloped rolls of film and disposable cameras.  Also,
Surveillance hardware, including but not limited to, camera's and
attached hard drives.

(*Id.*).  The warrant authorized the officers to enter the premises without providing notice to the

occupants and to search any occupants located inside the premises.  (*Id.* at 2).

The application for the warrant was based upon the affidavit of Paul Helfer

("Helfer"), an officer with the Rochester Police Department ("RPD").  (*Id.* at 3-8).  Helfer's

affidavit described observations made by Investigator Wengert ("Wengert") on October 1, 2015,

during the course of an investigation of drug activity in the area of 14 and 24 Fern Street.

According to the affidavit, inside 24 Fern Street, Wengert observed a video system that

monitored the rear of the house, the east side yard of the house, and two side doors to the house.

(*Id.* at 5 ¶ 1).  The affidavit also reported that Wengert observed that all of the doors were

barricaded.  (*Id.*).

Helfer's affidavit stated that on October 1, 2015, Wengert also discovered

sixty-three bags of crack cocaine in a dryer vent located on the rear side of 14 Fern Street.  (*Id.*).

Lewis was arrested that same day and charged with criminal possession of marijuana after

Wengert observed him walking from 14 Fern Street to the porch area of 24 Fern Street.  (*Id.*).

Helfer's affidavit described two subsequent controlled purchases of narcotics

made by a confidential informant (the "informant") from 24 Fern Street.  In his affidavit, Helfer

affirmed that the informant was personally known to RPD officers and had previously provided reliable information about narcotics trafficking and gun possession. (*Id.* at 7 ¶ 8).

  The first controlled purchase occurred on October 9, 2015 and was supervised by RPD Investigator Gonzalez ("Gonzalez") and United States Border Protection Agent Bush ("Bush"). (*Id.* at 5 ¶ 2). Prior to the controlled purchase, Gonzalez and Bush met with the informant, searched him[3] for narcotics, and provided him currency and an electronic monitoring device. (*Id.* at 5-6 ¶ 2). Gonzalez and Bush then transported the informant to the area of 24 Fern Street and dropped him off. (*Id.*). The informant approached 24 Fern Street and met a male who asked the informant whether he wanted "hard." (*Id.* at 6 ¶ 3). The informant asked to purchase six bags of heroin. (*Id.*). The male went inside 24 Fern Street and asked another male for six bags while the informant waited outside. (*Id.*). The informant provided the purchase money to the male. (*Id.*). The informant was escorted to an abandoned gray house across the street and provided directions for future transactions; specifically, he was directed to ring a doorbell in order to signal the occupants of 24 Fern Street to leave the premises and complete the transaction. (*Id.*). After purchasing the heroin, the informant met with Gonzalez and Bush, returned the electronic monitoring device, and provided them with six bags of heroin. (*Id.* at 6 ¶¶ 3-4).

  The second controlled purchase occurred a few days later on October 13, 2015. (*Id.* at 5 ¶ 5). Prior to the controlled purchase, Helfer and Investigator Bernabei ("Bernabei") met with the informant, searched him for narcotics, provided him currency and an electronic monitoring device, and dropped him off in the area of 24 Fern Street. (*Id.*). The informant went to the abandoned house across the street from 24 Fern Street and rang the bell. (*Id.* at 6 ¶ 6). A

---

[3] The affidavit does not disclose whether the informant was male or female. For ease of reference, a male pronoun will be used herein.

male approached from the area of Angle Street and Fern Street, spoke to the informant, and then entered 24 Fern Street, while the informant waited on the porch of the abandoned house.  (*Id.*).  Another male emerged from 24 Fern Street and walked over to the waiting informant at the abandoned house.  (*Id.*).  The male was observed to have a bundle in his left pants pocket.  (*Id.*).  The informant provided the buy money to the male.  (*Id.*).  Afterwards, the informant met with Helfer and Bernabei and returned the electronic monitoring device and ten bags of heroin.  (*Id.* at 6 ¶¶ 6-7).

## II.      Irvin's Affidavit

In support of his suppression motion, Irvin submitted an affidavit affirming that he had been an overnight guest at 24 Fern Street the night before October 15, 2015, the morning the warrant was executed, and was present at that location and arrested during the search.[4] (Docket # 62 at ¶ 2).  Irvin stated that he was a guest of Joseph Green, a legal tenant of the premises.  (*Id.* at ¶ 3).  According to Irvin, each time he had visited the premises, Green had been present and had invited him to visit.  (*Id.* at ¶ 4).  Prior to October 15, 2015, Irvin had visited 24 Fern Street two or three times.  (*Id.*).  Irvin affirmed that personal papers found in one of the bedrooms belonged to him, as did a cell phone, a jacket and $ 777 in currency seized from his person, and that he maintained a reasonable expectation of privacy in those items.  (*Id.* at ¶ 6).  He also affirmed that he did not consent to a search of his person or any of the items belonging to him.  (*Id.*).

---

[4] Irvin submitted an earlier affidavit containing similar assertions.  (Docket # 49-3).

## III.   **Brook's Affidavit**

In support of his suppression motion, Brooks submitted an affidavit affirming that in October 2015 Joseph Green, the renter of 24 Fern Street, gave him permission to stay there and provided him with a key to the front door.[5]   (Docket # 54 at 15-16).   According to Brooks, he occasionally stayed there to be closer to his pregnant girlfriend, who lived nearby.   (*Id.*). Brooks was present at 24 Fern Street when officers executed the warrant on October 15, 2015. (*Id.*).   Brooks had spent the night before there and was located by the executing officers in the bedroom that he had used.   (*Id.*).   Brooks affirmed that his identification, clothes, and some of his possessions were also in the room.   (*Id.*).   Brooks stated that he did not give RPD officers permission to enter the house or the bedroom in which he was staying.   (*Id.*).   According to Brooks, he had an expectation of privacy in the house and in his personal possessions located there.   (*Id.*).

## IV.   **Lewis's Affidavit**

Lewis also submitted an affidavit in support of his motion to suppress.[6]   (Docket # 61-1).   Lewis affirmed that in October 2015 he was given permission by the "renters" of 24 Fern Street to stay overnight there and had stayed overnight on numerous occasions.   (*Id.*). Lewis further affirmed that he had stayed overnight at 24 Fern Street the night before the officers executed the warrant on the morning of October 15, 2015.   (*Id.*).   According to Lewis, he was

---

[5]   On February 22, 2016, during the oral argument on Brook's motion, the Court granted Brooks leave to file a supplemental affidavit in support of his suppression motion.   (Docket # 67).   By letter dated February 25, 2016, counsel for Brooks informed the Court that Brooks would not be submitting a supplemental affidavit.

[6]   On March 9, 2016, during oral argument on Lewis's motion, the Court granted Lewis an opportunity to file a supplemental affidavit in support of his suppression motion.   (Docket # 71).   By letter dated March 25, 2016, counsel for Lewis informed the Court that Lewis would not be submitting a supplemental affidavit.

present in the living room when the officers entered 24 Fern Street on October 15.  (*Id.*).  Lewis stated that he did not give the police permission to enter the premises.  (*Id.*).

## REPORT & RECOMMENDATION

### I.      Suppression of Tangible Evidence

I turn first to defendants' motions to suppress the evidence seized pursuant to the execution of the search warrant for 24 Fern Street.  (Docket ## 49, 54, 58, 61).  Each defendant maintains that the warrant was defective because it was based upon information learned during the course of a warrantless search of 24 Fern Street that occurred on October 1, 2015.  (Docket ## 49 at ¶¶ 7-8; 54 at 3-8; 61 at 23-24, ¶¶ 4-6).  Additionally, Irvin maintains that suppression of evidence located outside the house is warranted because, although the terms of the warrant authorized a search of the curtilage of 24 Fern Street, the application failed to demonstrate probable cause supporting such a search.[7]  (Docket # 58 at ¶¶ 5-20).  For purposes of this motion, the government does not contest the purported illegality of the October 1 warrantless search.[8]

The government opposes the motions on several grounds.  First, it maintains that none of the defendants have demonstrated a reasonable expectation of privacy in 24 Fern Street.  (Docket ## 50 at 2-3; 63 at 2-6; 65 at 10-14).  Second, it argues that even if the reported observations inside the premises on October 1, 2015 were excised from the affidavit, the warrant is still supported by probable cause.  (Docket ## 63 at 6-10; 65 at 14-18).  Third, the government

---

[7]  Irvin has withdrawn his argument that the warrant insufficiently particularized the items to be searched for and seized.  (Docket # 58 at ¶ 3).

[8]  The government's papers assert that Wengert was lawfully present inside 24 Fern Street on October 1, 2015 in response to a possible burglary.  (Docket # 63 at 7).  When the Court indicated at oral argument that an evidentiary hearing would be necessary to develop the facts upon which the lawfulness of Wengert's entry could be determined, the government declined to press its argument as to the lawfulness of the warrantless entry.  Instead, the government urges that, even assuming the unlawfulness of Wengert's entry, the search warrant for 24 Fern Street was valid.  Considering the government's position, the Court will assume for purposes of these motions that Wengert's warrantless entry into the residence on October 1 was unlawful.

maintains that the probable cause showing justifying the search of the dwelling also justifies the search of the curtilage.  (Docket # 59).  Finally, the government maintains that the officers relied upon the warrant in good faith.[9]  (Docket # 65 at 19).

A.      **Standing**

The affidavits submitted by the defendants sufficiently allege standing to challenge the search warrant for the premises located at 24 Fern Street on October 15, 2015.  *See Minnesota v. Olson*, 495 U.S. 91, 98 (1990) (establishing that overnight guest has legitimate expectation of privacy in host's home); *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997) ("society recognizes as legitimate the expectation of privacy possessed by an overnight guest – even though he has at best a fleeting connection to his host's home") (citing *Minnesota v. Olson*, 495 U.S. at 98).  Each defendant has affirmed, *inter alia*, that he received permission from the individual who rented the premises to stay overnight in the premises and was an overnight guest on the night before the warrant was executed.  (Docket ## 54, 61-1, 62).  These allegations are adequate to establish that each, as an invited guest, had a reasonable expectation of privacy inside 24 Fern Street.  *See*, *e.g.*, *Olson*, 495 U.S. at 98 ("[i]t is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises"); *United States v. Osorio*, 949 F.2d 38, 41 (2d Cir. 1991) (guests have an expectation of privacy in host's home except for "areas of the host's home that are off limits to the guest or of which the guest has no knowledge"); *United States v. Peña Ontiveros*, 547 F. Supp. 2d 323, 329-30 (S.D.N.Y. 2008) (overnight guests' "expectation of privacy extended to all of the rooms of the residence").

---

[9]  The government has asserted the good faith argument only in response to Lewis's motion.  (Docket # 65 at 19).

I agree with the government (Docket ## 63 at 4-6; 65 at 12-14) that a somewhat closer question exists as to whether defendants have established standing to challenge the items seized from the exterior of the residence.  (Docket ## 50 at 5; 63 at 4-6; 65 at 12-14).  *See United States v. Houston*, 2014 WL 259085, *16 (E.D. Tenn. 2014) (defendant had reasonable expectation of privacy in curtilage immediately surrounding his brother's mobile home where he visited daily and was an occasional overnight guest), *aff'd*, 813 F.3d 282 (6th Cir. 2016); *United States v. Peña Ontiveros*, 547 F. Supp. 2d at 329-30 (overnight guests' expectation of privacy did not extend to items found inside hidden trap in house); *United States v. Cruz*, 475 F. Supp. 2d 250, 258 (W.D.N.Y. 2007) (occasional overnight guest did not have standing to challenge search of refrigerator located in basement of premises).  Moreover, it is questionable whether defendants' affidavits demonstrate that they had a reasonable expectation of privacy in 24 Fern Street on October 1, 2015, when Wengert entered and observed the video surveillance equipment.[10]  *See United States v. Shakur*, 560 F. Supp. 358, 360 (S.D.N.Y. 1983) (defendant could not challenge validity of warrant on the grounds that it was based upon information obtained during unlawful prior search where defendant had no standing to challenge the prior search; "[defendant] claims that the evidence giving probable cause for the searches in question was obtained from illegal searches [of other premises;] [i]t is unnecessary to determine whether [those prior searches] were in fact improper [because] [t]he defendant lacks standing to attack these searches or the fruits thereof"); *United States v. Romano*, 203 F. Supp. 27, 31 (D. Conn. 1962) ("[i]t is not sufficient to show, as the movants have attempted, that there was an unreasonable [prior] search and seizure . . . directed at someone else, and that they were aggrieved by the use of information acquired [during that search], in the subsequent search and

---

[10]  This challenge was made in opposition to Lewis's motion, but not specifically in opposition to the other defendants' motions.  (Docket ## 50, 59, 63, 65 at 15).

seizure . . . when the warrant was executed[;] [t]o hold otherwise would be in effect saying that information obtained by an unreasonable search and seizure cannot be used by the federal authorities for any purpose whatsoever against anyone, whether or not they were aggrieved parties").  Regardless of the standing issues, I conclude that the warrant was valid and that suppression is not warranted.

### B.      Suppression under *Wong Song*

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search."  *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (internal citations omitted); *see Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963); *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.), *cert. denied*, 513 U.S. 877 (1994).  This doctrine applies not only to direct evidence, but also to tangible and testimonial evidence derived from the tainted evidence "up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'"  *Murray v. United States*, 487 U.S. at 587 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Under the independent source doctrine, evidence originally discovered by illegal means but later seized pursuant to lawful means will not be suppressed.  *Murray*, 487 U.S. at 542; *see also United States v. Johnson*, 994 F.2d 980, 987 (2d Cir.) ("[c]ourts have applied the independent source exception in cases where the police stumble upon evidence while engaging in an unlawful search or entry, but where there was an independent basis apart from the illegal entry to allow a warrant to issue"), *cert. denied*, 510 U.S. 959 (1993); *United States v. O'Brien*, 498 F. Supp. 2d 520, 540 (N.D.N.Y. 2007) ("[i]f police seize evidence pursuant to a valid search warrant obtained on the basis of information unconnected to an earlier Fourth Amendment

violation, there is an independent source for the seizure, and the evidence is untainted and admissible"), *aff'd*, 303 F. App'x 948 (2d Cir. 2008).  The independent source exception requires proof that:  "(1) the warrant . . . [is] supported by probable cause derived from sources independent of the illegal entry; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct."  *United States v. Bonczek*, 391 F. App'x 21, 24 (2d Cir. 2010) (citing *United States v. Johnson*, 994 F.2d at 987).

Helfer's warrant affidavit clearly included observations that Wengert made during the course of his warrantless entry, namely, the "4 channel video system" and the "2x4 barricades."  (Docket # 49-2 at 5, ¶ 1).  Yet, "'the mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant'[;] . . . [r]ather, a reviewing court 'should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'"  *United States v. Ahmad*, 2012 WL 1944615, *6 (W.D.N.Y.) (quoting *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997)), *report and recommendation adopted*, 2012 WL 3028302 (W.D.N.Y. 2012).  Thus, the salient question is whether, excising the observations made inside the residence on October 1, 2015, the remaining allegations in the application are sufficient to establish probable cause to support the warrant.  I conclude that they are.

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement.  According to the Court, the issuing judicial officer

must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. at 238.  A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate").  Moreover, "resolution of doubtful or marginal cases should be largely determined by the preference to be afforded to warrants." *United States v. Smith*, 9 F.3d at 1012 (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

Helfer's affidavit described Wengert's observations on October 1, 2015 of Lewis walking between 14 Fern Street and 24 Fern Street and his discovery of sixty-three bags of crack cocaine located in a dryer vent on the back of 14 Fern Street.  (Docket # 49-2 at 5, ¶ 1).  Helfer's affidavit also described two controlled purchases that occurred later in October in and around 24 Fern Street.  (*Id.* at 5-7, ¶¶ 2-8).  The first of these purchases was conducted on the porch of 24 Fern Street on October 9.  (*Id.* at 6, ¶ 3).  According to Helfer, the informant approached a male on the porch of 24 Fern Street, who inquired whether the informant wanted "hard," entered 24 Fern Street, and returned to the porch where the informant was waiting to complete the heroin sale.  (*Id.*).

The informant was then brought across the street to an abandoned house and given instructions about how to make future purchases.  (*Id.*).  Consistent with those instructions, on October 13, the informant rang the doorbell of the abandoned house and was approached by a

male; the informant conversed with the male, who then left the house and entered 24 Fern Street. (*Id.* at 6, ¶ 6). A different male emerged from 24 Fern Street, with a visible bulge in his pants, and met the waiting informant at the abandoned house to complete the heroin sale. (*Id.*). I easily conclude that these allegations, taken together, provide adequate probable cause to support the warrant.

Concluding that the first requirement of the independent source doctrine is met does not end the inquiry. I must also consider whether the investigating officers would have applied for a warrant in the absence of Wengert's unlawful entry. *See United States v. Bonczek*, 391 F. App'x at 24 (second prong of the independent source inquiry is whether the decision to seek the warrant was "prompted by information gleaned from the illegal conduct") (internal quotations omitted). I conclude that the second requirement is also satisfied.

"The primary evil that the motivational inquiry seeks to root out is the so-called 'confirmatory search,'" which occurs "when officers conduct a search to get assurance that evidence is present before taking the time and effort to obtain a warrant." *United States v. Hanhardt*, 155 F. Supp. 2d 840, 847-48 (N.D. Ill. 2001). In this case, the complaint indicates that RPD members were conducting surveillance of 24 Fern Street on October 1, 2015 as part of an ongoing narcotics investigation based upon information that "had been developed from several sources that the residence at 24 Fern Street was being used as a drug house to sell quantities of heroin." (Docket # 1 at ¶ 3). That ongoing investigation had included an earlier controlled purchase near the porch area of 24 Fern Street on August 14, 2015. (Docket # 63 at 9 n.2).[11] The information gathered by law enforcement also apparently included a tip from a

---

[11] The government represented in its motion papers that this controlled purchase had occurred (*see* Docket # 63 at 9 n.2), although it is not mentioned in the warrant affidavit.

"concerned citizen" who provided the police "with information regarding drug activity at 24 Fern Street." (Docket # 49 at ¶ 30).

Further, prior to Wengert's entry into 24 Fern Street on October 1, he had observed Lewis walking between the premises located at 24 Fern Street and 14 Fern Street, where he had discovered sixty-three bags of crack cocaine stashed in a dryer vent located in the outside back wall. (Docket ## 49-2 at 5, ¶ 1; 49 at ¶ 7). On the record before the Court, I find that these circumstances demonstrate that the investigation of 24 Fern Street was well underway before, and was not prompted by, Wengert's unlawful entry. *See United States v. Barefoot*, 391 F. App'x 997, 999 (3d Cir. 2010) (informant's tip and subsequent investigation of tip, rather than unlawful entry, prompted law enforcement to obtain warrant); *United States v. David*, 943 F. Supp. 1403, 1417 (E.D. Va. 1996) (sequence of events demonstrated that the "investigation of [defendant] after the alleged illegal search was simply a continuation of a previously instituted investigation[;] . . . [t]hus, the investigation of [defendant], which occurred after the alleged illegal search, was completely unrelated to the illegal search and the facts uncovered thereunder").

No information suggests that Wengert seized any evidence during his warrantless entry on October 1. Moreover, nothing in the record suggests that the officers immediately attempted to obtain a warrant for the premises. Instead, the officers continued their investigation for another two weeks and conducted two more controlled purchases prior to securing a search warrant for the premises. On this record, I find that the investigating officers would have applied for a search warrant even absent Wengert's warrantless entry. *United States v. Swope*, 542 F.3d 609, 616 (8th Cir. 2008) (district court properly concluded that information known to officers and not the observations made during an illegal entry prompted law enforcement to seek

warrant), *cert. denied*, 555 U.S. 1145 (2009); *United States v. Madrigal*, 103 F. App'x 9, 12 (7th Cir. 2004) (district court properly concluded that observations during illegal search did not prompt officers to seek search warrant because it was reasonable to conclude that officers would have sought a warrant based upon their independent knowledge); *Johnson*, 994 F.2d at 987 ("[c]learly, the agents would have and could have applied for and been issued a warrant" where there was probable cause to issue a warrant and where "the only reason the agents failed to apply for a warrant prior to [unlawful search] . . . was their mistaken belief that they were entitled to do so"); *United States v. Lyons*, 2015 WL 999922, *8 (D. Minn. 2015) (concluding that officers would have applied for search warrants even had they not conducted impermissible canine sniff where information known to officers made "clear to th[e] [c]ourt" that the "officers would have sought the warrants even if there had been no positive indication for narcotics by [the canine]"); *United States v. Medina*, 2014 WL 4101531, *6 (S.D. Fla. 2014) (concluding that officer would have applied for a warrant based upon information known to him even if he had not unlawfully entered defendant's room), *aff'd*, 631 F. App'x 682 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1397 (2016); *United States v. Stabile*, 2009 WL 8641714, *4 (D.N.J. 2009) ("[i]t is inconceivable that, informed [of patently incriminating file names on a computer hard drive], [the agent] would not have sought a warrant to search the hard drives for child pornography"), *aff'd*, 633 F.3d 219 (3d Cir.), *cert. denied*, 132 S. Ct. 399 (2011); *United States v. Terry*, 41 F. Supp. 2d 859, 866 (C.D. Ill. 1999) ("[a]lthough [the officers] did not testify as to whether they would have sought the federal search warrant absent the seizure . . . , the evidence shows that . . . [t]he police officers conducting the investigation had ample information to show that an additional search . . . was warranted"), *aff'd*, 214 F.3d 900 (7th Cir.), *cert. denied*, 531 U.S. 891 (2000); *United States v. David*, 943 F. Supp. at 1418 ("the search warrant was not sought in

order to sterilize the fruits of the prior tainted search[;] . . . the court finds that the agents would have continued to investigate [defendant] and would have applied for the search warrant even had they not [conducted the unlawful search]").  Accordingly, I find that suppression of the tangible evidence seized from 24 Fern Street is not required under the independent source doctrine.

Brooks argues that all of the information relating to 24 Fern Street that was gathered by law enforcement subsequent to Wengert's entry is tainted by his unlawful entry. (Docket # 54 at 8).  Brooks posits that the observations made during Wengert's entry caused RPD to focus on 24 Fern Street and prompted the controlled purchases, thus tainting them.  (*Id.*). I disagree.

As described above, the record makes clear that RPD was already conducting an investigation of 24 Fern Street prior to the warrantless entry.  That investigation included surveillance of the area, a controlled purchase from the porch area of 24 Fern Street, and the discovery of sixty-three bags of narcotics hidden in the abandoned house next door.  Under these circumstances, I conclude that even if Wengert had not entered the property and observed the barricades and video surveillance, the investigation would have continued and additional controlled purchases would have been conducted.  *See United States v. Barefoot*, 391 F. App'x at 999 ("[t]he court may presume law enforcement officers will act reasonably, absent evidence to the contrary"); *United States v. Swope*, 542 F.3d at 615 (district court properly concluded that officers would have continued investigation "regardless of the prior illegal entry and interrogation").  For these reasons, I conclude that the information obtained from the controlled purchases need not be excised from the affidavit.

Brooks also maintains that if Wengert's observations of the video surveillance and barricades are excised from the warrant, the remaining allegations are insufficient to justify the no-knock authorization.  As an initial matter, I disagree that the remaining allegations do not justify a no-knock authorization.  In his affidavit, Wengert stated that in his experience, "drug traffickers routinely have methods in place to quickly and efficiently destroy or severely alter contraband to prevent law enforcement from recovering evidence to be used in future court proceedings."  (Docket # 49-2 at 5).  Additionally, Wengert stated that the items to be seized included "small plastic bags" containing heroin that could "be easily and quickly disposed of or destroyed."  (*Id.* at 7).  Wengert also described two controlled purchases in the vicinity of 24 Fern Street.  Taken together, these allegations are sufficient to justify no-knock authorization. *United States v. McCloud*, 2006 WL 1144509, *3 (W.D.N.Y. 2006) (affidavit recounting multiple controlled purchases and including assertions relating to officer's experience that those engaged in narcotics trafficking will attempt to destroy evidence if forewarned of impending search was sufficient to justify issuance of a no-knock warrant), *aff'd,* 303 F. App'x 916, 918 (2d Cir. 2008).  In any event, "even if [Helfer's] experience was insufficient to meet the 'not high' standard for reasonable suspicion [justifying no-knock authorization] . . . , the defect was not so obvious as to preclude the executing officers' reliance on the warrant."  *United States v. McCloud*, 303 F. App'x at 918.  Finally, "both the Supreme Court and the Second Circuit have clearly stated that the exclusionary rule does not apply to any evidence seized as a result of a violation of either the Fourth Amendment 'knock and announce' rule or 18 U.S.C. § 3109." *United States v. Cooper*, 2011 WL 6180035, *4 (D. Vt. 2011) (citing *Hudson v. Michigan*, 547 U.S. 586, 594 (2006) and *United States v. Acosta*, 502 F.3d 54, 61 (2d Cir. 2007), *cert. denied*, 552 U.S. 1154 (2008)).

17

### C.   Overbreadth of the Warrant

Irvin also seeks to suppress the evidence seized from the exterior of 24 Fern Street.  (Docket ## 49 at ¶¶ 17-24; 58 at ¶¶ 5-20).  He acknowledges that the warrant was supported by sufficient probable cause for a search of the interior of the residence, but argues that it was not supported by adequate probable cause to believe that contraband would be found outside the house.  (Docket # 58 at ¶¶ 7-8, 11, 17).  Thus, Irvin contends the items seized from a wooden box buried at the rear of the house, inside a garbage can, and behind a brick near the front of the residence must be suppressed.  (*Id.* at ¶ 11).  Irvin argues that *Leon* is inapplicable because the affiant for the warrant application was aware of the absence of probable cause and participated in the warrant execution.  (*Id.* at ¶¶ 21-23).  The government contends that as long as probable cause exists to search the inside of a dwelling, no separate showing of probable cause is necessary to search the curtilage immediately surrounding the building.  (Docket # 59 at 1-3).

In general, the Warrants Clause of the Fourth Amendment "requires particularity and forbids overbreadth."  *United States v. Levy*, 2013 WL 664712, *5 (S.D.N.Y. 2013) (quoting *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009)), *aff'd*, 803 F.3d 120 (2d Cir. 2015).  Although these two issues often raise overlapping concerns, they are distinct legal issues. *Id.*  Overbreadth "deals with the requirement that the scope of the warrant be limited to the probable cause on which the warrant is based."  *Id.* (internal quotation omitted).  In contrast, "particularity concerns arise when a warrant's description of the place to be searched or the items to be seized 'is so vague that [it] fails reasonably to alert executing officers to the limits' of their search and seizure authority."  *Id.* (quoting *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011)).

Acknowledging the existence of contrary authority, and without citation to any direct authority supporting his contention, Irvin maintains that the warrant was overbroad because it authorized a search of the curtilage despite the absence of demonstrated probable cause to believe that contraband would be found outside the house.  As the Supreme Court recently articulated, the "area 'immediately surrounding and associated with the home' – what our cases call the curtilage – [is] 'part of the home itself for Fourth Amendment purposes.'" *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).[12]  Further, it is well-settled that "[a] lawful search of a fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Ross*, 456 U.S. 798, 820-21 (1982) ("a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found").  That area includes areas within the curtilage of the premises.  *United States v. Gorman*, 104 F.3d 272, 275 (9th Cir. 1996) ("[i]f a search warrant specifying only the residence permits the search of 'closets, chests, drawers, and containers' therein where the object searched for might be found, so should it permit the search of similar receptacles located in the outdoor extension of the residence, i.e., the curtilage[;] . . . [t]o hold otherwise would be an exercise in pure form over substance"); *United States v. Flemino*, 2015 WL 6739580, *12 (D. Minn.) ("[b]ecause the search warrant authorized the search of the [residential] premises . . . , it authorized a search of the grounds, and any buildings, containers, or vehicles on the premises in which contraband might be found, including the garbage can located in the yard just outside the home"), *report and recommendation adopted*,

---

[12] Irvin argues that this language from *Jardines* should be invoked only as a shield to protect against unreasonable searches, and not by the government to justify challenged searches.  (Docket # 58 at ¶ 14).  Such an argument, in my estimation, is neither logical nor practical.

2015 WL 6756107 (D. Minn. 2015); *Williams v. Hetzel*, 2010 WL 5391606, *9 (S.D. Ala.)

("[t]he fact that the garbage can [located in the front yard of the residence] was not expressly

listed in the warrant is not enough, standing alone, to establish that there existed a legitimate

basis for suppressing the evidence seized from the can"), *report and recommendation adopted*,

2010 WL 5441933 (S.D. Ala. 2010); *United States v. Pugh*, 2003 WL 21220333, *4 (D. Conn.

2003) ("if the place to be searched is identified by street number, the search is not limited to the

dwelling house, but may also extend to the garage and other structures deemed to be within the

curtilage") (quoting Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth

Amendment*, § 4.10(a) (3d. ed. 1996)).

I thus conclude that a warrant authorizing a search of a dwelling authorizes a

search of the inside and surrounding exterior areas of the house, regardless of whether the

application includes any factual assertions relating to the exterior of the house.[13] *See United*

*States v. Bennett*, 170 F.3d 632, 639 (6th Cir. 1999) (upholding search of residence and nearby

outbuilding because "there is no need to search for evidence to link the outbuilding to the

allegations in the affidavit; the shop building and the residence are sufficiently connected

because they are both within the curtilage of the defendant's property"); *United States v.*

*Popham*, 382 F. Supp. 2d 942, 953 (E.D. Mich.) (search warrant properly authorized search of

dwelling even though facts in affidavit only related to observations of contraband in outbuilding;

"[w]hen probable cause exists to search one building 'within the curtilage of the property, there

[is] no need to demonstrate probable cause to search each building on the property'") (quoting

*United States v. Campbell*, 256 F.3d 381, 390 (6th Cir. 2001), *abrogated on other grounds by*

---

[13]   Although not required, Helfer's affidavit did contain some factual allegations relevant to the search of the exterior of 24 Fern Street.  First, none of the controlled purchases occurred inside of 24 Fern Street, and one occurred on the porch of 24 Fern Street.  The affidavit also recounted the discovery of sixty-three bags of narcotics stashed in a dryer vent of a neighboring property that Lewis was observed walking from on his way to the porch area of 24 Fern Street.

*Begay v. United States*, 553 U.S. 137 (2008)), *reconsideration denied*, 2005 WL 3008614

(E.D. Mich. 2005), *aff'd*, 250 F. App'x 170 (6th Cir. 2007).  Accordingly, I recommend denial of

Irvin's motion to suppress evidence seized from the curtilage.  *See United States v. Gorman*, 104

F.3d at 275 (suppression of items found in jar partially buried in immediate exterior of the

premises not warranted; "the search of the curtilage in this case was authorized because it was

inseparable for privacy purposes from the bus-residence identified in the warrant"); *United States*

*v. Flemino*, 2015 WL 6739580 at *12 (suppression of items found in garbage can located in the

curtilage of the residence not warranted); *Williams v. Hetzel*, 2010 WL 5391606 at *9

(suppression of items seized from garbage can not warranted where defendant "does not dispute

that there was probable cause for the issuance of the search warrant for the residence, and where

the garbage can was located in the front yard of the residence, and could be reasonably deemed

as within the curtilage of the residence"); *United States v. Pugh*, 2003 WL 21220333, *4

(D. Conn. 2003) (suppression of items seized from behind air conditioner unit located outside

bedroom window not warranted; "[e]ven if the [c]ourt were to accept [defendant's] argument

that the search outside his bedroom window was outside the express scope of the warrant, that

area would fall within the residence's 'curtilage'").

        In any event, nothing in the record suggests that the searching officers did not rely

upon the search warrant in good faith.  In *United States v. Leon*, 468 U.S. 897 (1984), the

Supreme Court held that the Fourth Amendment exclusionary rule should not be applied to

evidence obtained by a police officer whose reliance on a search warrant issued by a neutral

magistrate was based on "objective good faith," even though the warrant itself might ultimately

be found to be defective.  *Id.* at 918-23; *United States v. Salameh*, 152 F.3d 88, 114 (2d Cir.

1998), *cert. denied*, 525 U.S. 1112 (1999); *United States v. Benedict*, 104 F. Supp. 2d 175, 182

(W.D.N.Y. 2000).  The rationale underlying this good faith exception is that the exclusionary

rule "cannot be expected, and should not be applied, to deter objectively reasonable law

enforcement activity."  *United States v. Leon*, 468 U.S. at 919.  The warrant here was not so

facially deficient or so lacking in probable cause that reliance upon it would have been

objectively unreasonable.  *See id.* at 923; *United States v. Cancelmo*, 64 F.3d 804, 807 (2d Cir.

1995) (citations omitted).  Further, I conclude under the circumstances of this case that the fact

that the affiant participated in the warrant's execution does not render inapplicable the good faith

doctrine.  *See United States v. Stately*, 2012 WL 3288659, *10 n.16 (D. Minn.) (applying good

faith exception even though officer who submitted application for invalid warrant participated in

warrant's execution), *report and recommendation adopted*, 2012 WL 3288646 (D. Minn. 2012).


## DECISION & ORDER

### Identification of Confidential Informants

I turn finally to Lewis's motion for disclosure of the identities of confidential

informants, which is based upon his conclusory assertion that he needs the disclosure in order to

prepare his defense.  (Docket # 61 at 17-18).  At oral argument, counsel for Lewis maintained

that the identity of the informant who participated in the controlled purchases was necessary to

the preparation of Lewis's anticipated mere presence defense.  Counsel contended that the

knowledge of the nature and extent of the informant's visits to the premises, including any

interactions with Lewis or visits when Lewis was not present, would be material to Lewis's

defense.

The government represented that a single paid informant was used during the

controlled purchases.  The government indicated that it did not intend to call the informant to

testify at trial.  Rather, the government explained that it intended to offer evidence of the controlled purchases through the testimony of the police officers who arranged and monitored the purchases.  The government further represented that the informant did not identify Lewis as a participant in any of the controlled purchases.

After hearing argument on the motion, the Court directed the parties to confer further on the request and instructed counsel for Lewis to advise the Court in writing as to the status of the issue following the conferral.  By letter dated March 25, 2016, counsel for Lewis indicated that he would rest "upon the prior submission and arguments."

Having considered further the parties' submissions and their arguments, the Court has determined that further argument would be helpful.  Accordingly, oral argument shall be heard on **May 20, 2016**, at **9:30 a.m.**, to further address Lewis's motion for disclosure of the confidential informant's identity.


## **CONCLUSION**

For the reasons stated above, I recommend that the district court deny defendants' motions for suppression of tangible evidence seized from 24 Fern Street.  (Docket ## 49, 54, 58, 61).  As to Lewis's motion seeking disclosure of the identity of the confidential informant, additional oral argument shall be heard on **May 20, 2016**, at **9:30 a.m.**

**IT IS SO ORDERED.**


_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge


Dated:  Rochester, New York
　　　　May 2, 2016

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[14]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                              *s/Marian W. Payson*
                              MARIAN W. PAYSON
                         United States Magistrate Judge

Dated: Rochester, New York
       May 2, 2016

---

[14] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).